# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL BEAM and DOROTHY BEAM, in their own right and as Co-Administrators of the Estate of C.B., | NO. 3:15-cv-01126 |
| Plaintiffs, | (JUDGE CAPUTO) |
| v. | |
| WESTERN WAYNE SCHOOL DISTRICT | |
| Defendant. | |

## MEMORANDUM

Presently before me is a Motion for Summary Judgment (Doc. 50) filed by Defendant Western Wayne School District ("Defendant" or "WWSD"). Plaintiffs Michael and Dorothy Beam claim WWSD discriminated against their son, C.B. because of his disability in violation of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and Section 202 of the Americans with Disabilities Act ("ADA"). (Doc. 1, ¶¶ 60-73). Because a genuine dispute of material fact exists as to whether C.B. was denied a benefit under Section 504 of the Rehabilitation Act and the ADA and whether WWSD acted with deliberate indifference, Defendant's Motion for Summary Judgment will be denied.

## I. Background

The facts presented in the summary judgment record, viewed in the light most favorable to Plaintiffs, are as follows. Plaintiffs' son, C.B., tragically committed suicide after returning home from school on the last day of the 2012-2013 school year, his tenth grade year.

C.B. was born on November 26, 1996. (Doc. 51, "Def's. SMF," ¶ 1, Doc. 53-1,

"Pls.' SMF," ¶ 1).[1] In 2008, C.B. was diagnosed with Attention Deficit Hyperactive Disorder ("ADHD"). (Def.'s SMF ¶ 2, Pls.' SMF ¶ 2). From 2008 until his death, C.B. had a Section 504 plans in place at school to accommodate his ADHD. (Beam Dep. 47:11-12). C.B. was also receiving treatment at Friendship House from November of 2009 until his death, where he would go for individual and family therapy sessions because "[h]e struggled concentrating to focus on his academic work." (Hall Dep. 22:2-14, 74:3). In addition to therapy, C.B. was on Focalin, an ADHD medication that "assist[s] the child [] in the ability to concentrate, to focus, to be less impulsive." (*Id.* at 30:4-8).

By the end of the First Marking Period of the 2012-2013 school year, C.B. failed Biology. (Def.'s SMF ¶ 7; Pls.' SMF ¶ 7). Despite the provision in C.B.'s Section 504 Plan providing that "[C.B.]'s mother and his teachers will have communication via email when there are any concerns with [C.B.]'s progress[,]" Plaintiffs only learned about C.B.'s failing grade from his report card and subsequent failure notice mailed home. (Beam Dep. 56:17; Def.'s SMF, Ex. "C"[2] at 1). While Mrs. Beam was initially

---

[1] Local Rule 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issue for trial. *See id.* Both parties filed Rule 56.1 statements. (*See* Def's. SMF, *generally*; Pls.' SMF, *generally*). Several paragraphs of Plaintiffs' opposition "den[y] as stated" the corresponding paragraph in Defendant's statement. These denials, however, are sometimse nonresponsive to Defendant's factual statement and do not deny the substance of those paragraphs. Insofar as the denials are not responsive to Defendant's factual statements, they can properly be deemed undisputed by virtue of Plaintiff's failure to comply with Rule 56.1. *See Weitzner v. Sanofi Pasteur, Inc.*, No. 17-3188, slip op. at 21-23 (3d Cir. Nov. 27, 2018).

[2] Exhibit "C" to Defendant's factual statement includes both C.B.'s original and amended Section 504 plans. This citation refers to C.B.'s original Section 504 Plan.

2

able to access C.B.'s grades and other educational information using the online program, Schoolbook, through her son's account, she was no longer able to access the program after her son's password was taken away around October of 2012. (Def.'s SMF ¶ 24; Beam Dep. 50:1-8, 51:18-52:25).[3] Mrs. Beam planned to attend parent-teacher conferences in November of 2012, but she suddenly came down with "a stomach virus" and "had to turn around and go home" instead. (Beam Dep. 39:9-25).

By the end of the Second Marking Period, C.B. failed four (4) of his classes. (Def.'s SMF ¶ 8; Pls.' SMF ¶ 8). Again, Plaintiffs only learned about C.B.'s failing grades from his Second Marking Period report card and subsequent failure notice. (Beam Dep. 56:21, 57:13-14). By the end of the Third Marking Period, C.B. failed five (5) of his courses. (Def.'s SMF ¶ 10, Pls.' SMF ¶ 10). Plaintiffs once again only learned about C.B.'s failing grades from his Third Marking Period report card and subsequent failure notice. (Beam Dep. 57:4, 13-14).

Around March or April of 2013, not long after receiving his Third Marking Period grades, C.B. expressed suicidal ideation to his therapist, Mary Ann Hall. (Beam Dep. 61:25, 62:11; Hall Dep. 24:4-11). Ms. Hall explained that at the time, C.B. "felt as though he were a failure and that his parents, especially his father . . . would view him as a failure and he had difficulty coping with that." (Hall Dep. 24:4-11). Ms. Hall informed Mrs. Beam of C.B.'s suicidal ideation. (Beam Dep. 61:25, 62:11).

After receiving notice of C.B.'s failing grades, Mrs. Beam contacted the school to request a meeting because she felt "nobody was contacting [her]." (*Id.* at 48:10-13). Mrs. Beam spoke with the Guidance Counselor, Kasey Ann Gribble, on either April

---

[3] Mrs. Beam was informed by then-Principal Barrett that C.B. was using the internet to access pornography and that his ability to use the internet was being discontinued. (Beam Dep. 51:18-52:1). Even though, as Mrs. Beam testified in her deposition, another student was held responsible for the incident either instead or in addition to C.B., his password for Schoolbook was remained revoked. (*Id.* at 52:1-24).

3

24 or 26, 2013, expressing her concern that C.B.'s Section 504 Plan was not being properly followed and requested a meeting with the school. (Beam Dep. 60:21-61:3; Gribble Dep. 30:22-23). The meeting was confirmed for April 30, 2013 by a phone call and a letter in the mail. (Beam Dep. 66:20-21).

Present at the April 30, 2013 meeting were Mrs. Beam, a friend of Mrs. Beam's, Mrs. Gribble, several of C.B.'s teachers, and Ms. Hall, who participated via speakerphone. (Def.'s SMF ¶ 13, 14; Pls.' SMF ¶ 13, 14). The meeting participants discussed C.B.'s existing Section 504 Plan and Ms. Hall informed the attendees of C.B.'s suicidal ideations, explaining that "they related to his fear of failing." (Hall Dep. 25:8-11). As a result of this meeting, C.B.'s Section 504 Plan was amended to include four (4) new provisions ("Amended Section 504 Plan"): (1) "Bi-monthly Schoolbook progress reports will be mailed home[,]" which would be the responsibility of the "Guidance Secretary"; (2) "Classroom teachers clarify assignment instructions and deadlines with [C.B.]"; (3) "[C.B.] will meet with his guidance counselor bi-monthly for organizational and locker clean-up check ins"; and (4) "Classroom teachers will assist [C.B.] with breaking large projects and assignments into smaller sections." (Def.'s SMF, Ex. "C" at 6-7). In addition to these amendments to C.B.'s previous Section 504 Plan, C.B.'s teachers agreed to accept any missing documents or assignments that were located while trying to help C.B. organize, and to change his grades from previous marking periods based on how he performed on those assignments. (Gribble Dep. 38:21, 39:1-3).

On or about May 9, 2013, Mrs. Beam received a report pursuant to one of the new provisions in the Amended Section 504 Plan. (*Id.* at 89:5-10). The report reflected that C.B. was failing two classes at that time. (Def.'s SMF ¶ 27; Pls.' SMF ¶ 27). At some point after the Section 504 Plan Meeting, Mrs. Beam's access to Schoolbook was restored. (Beam Dep. 93:24-94:2).

On June 17, 2013, the last day of school, C.B. received his year-end grades: he failed three (3) courses for the year. (Def.'s SMF ¶ 29; Pls.' SMF ¶ 29). That day,

4

Mrs. Beam received a call from the principal, Mr. Barrett, explaining C.B. was involved in a physical altercation with another student on the bus and the police would be coming to her house as a result. (Beam Dep. 119:7-17). After speaking with Mrs. Beam about Mr. Barrett's call, Mrs. Beam's mother in law went over to the Beam household, discovered C.B. was dead, and informed Mrs. Beam. (Def.'s SMF ¶ 30; Pls.' SMF ¶ 30; Beam Dep. 119:18-25, 120:7, 15-18). C.B. left a suicide note that read:

> Hey sorry for this I know It will be hard for a while but overall it's for The best. I cannot live asa [sic] failure I'm sorry Mom and dad. Oh and Bryce sorry You will have one less member in the zombie apocolips [sic] HaHa. It is for the best sorry.

(Def.'s SMF, Ex. "J").[4]

On June 9, 2015, Plaintiffs filed a Complaint against WWSD, Anthony Zoppi, Ann Sledzinski, Kasey Phillips, James Rebar, and Michael Cole consisting of six (6) counts: (I) violation of Section 504 [of the Rehabilitation Act]; (II) violation of the [ADA]; (III) a Section 1983 claim based on state created danger; (IV) Loss of Consortium; (V) a Survival Action; and (VI) Wrongful Death. (Doc. 1). On July 31, 2015, all of the defendants named in the Complaint filed a Motion to Dismiss the Complaint. (Doc. 11). The Motion to Dismiss was granted in part on February 24, 2016 as to all of the individual defendants and Counts III-VI. (Doc. 15, Doc. 16). WWSD filed the instant Motion for Summary Judgment on July 16, 2018. (Doc. 50). This Motion has been fully briefed and is now ripe for review.

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[4] Exhibit "J" to Defendant's factual statement is a copy of C.B.'s handwritten suicide note.

5

matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248 An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law.

6

*Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III. Discussion

#### A. Failure to Exhaust Administrative Remedies Under the IDEA

The Individuals with Disabilities Act ("IDEA") requires plaintiffs exhaust their claims for relief under the appropriate administrative procedures before filing a civil action in district court. 20 U.S.C. § 1415(i)(2)(A). "Exhaustion of the IDEA's administrative process is also required in non-IDEA actions where the plaintiff seeks relief that can be obtained under the IDEA." *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014); *see also Jeremy H v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 281 (construing the language 20 U.S.C. § 1415(*l*) as "bar[ring] plaintiffs from circumventing IDEA's exhaustion requirement by taking claims that could have been brought under IDEA and repackaging them as claims under some other statute—*e.g.*, section 1983, section 504 of the Rehabilitation Act, or the ADA."). The IDEA exhaustion requirement therefore applies even in claims asserted under Section 504 and the ADA "if they seek relief that is available under the IDEA[,]" unless any exceptions apply. *Batchelor*, 759 F.3d at 273.

As a threshold issue, Defendant argues this Court lacks subject matter jurisdiction over Plaintiffs' claims, which could have been brought under the Individuals with Disabilities Act ("IDEA"), because they failed to exhaust their administrative remedies under the Act. (Doc. 52, Def.'s Br. at 8-12). In arguing their failure to exhaust their administrative remedies under the IDEA is excused, Plaintiffs implicitly concede they did in fact fail to exhaust these remedies and did not provide any evidence to the contrary. (Doc. 53, Pls.' Br. at 16-18). I therefore find Plaintiffs have not exhausted their administrative remedies under the IDEA.

Plaintiffs contend the exhaustion requirement does not apply to their claims under the futility exception[5] because C.B.'s death nullifies the efficacy of the IDEA's equitable remedies his family could obtain in an administrative proceeding. (Pls.' Br. at 17). Defendants counter that the futility exception does not apply because even though the IDEA's administrative remedies do not include compensatory damages, "the IDEA can provide at least some of the specific relief they provide." (Def.'s Br. at 12); *see Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 186-86 (3d Cir. 2009) (holding that compensatory damages are not available under the IDEA). Because Plaintiffs requested other forms of relief in addition to compensatory damages, including attorney's fees and "such other relief as this Court deems proper[,]" the fact that Plaintiffs' requested relief includes compensatory damages does not, on its own, constitute an exception to the exhaustion requirement. (Doc. 1¶ 94); *see Chambers*, 587 F.3d at 186-87; *Roquet v. Kelly*, 2013 U.S. Dist. LEXIS 145978 at \*26-\*28 (M.D. Pa. October 9, 2013) (Brann, J); *Fazlett v. Pocono Mountain Sch. Dist.*, 150 F. Supp. 2d 699, 706 (M.D. Pa. 2001) (Caputo, J.) ("It is enough to conclude

---

[5] "Where recourse to IDEA administrative proceedings would be futile or inadequate, however, the exhaustion requirement is excused." *See W.B. v. Matula*, 67 F.3d 484, 495 (3d Cir. 1995) *abrogated on other grounds by A.W. Jersey City Pub. Sch.*, 486 F.3d 791 (3d 2007) (citing *Honig v. Doe*, 484 U.S. 305, 326-27, 108 S. Ct. 592, 605-06 (1988); *Lester H. v. Gilhool*, 916 F.2d 865, 869 (3d Cir. 1990)).

that recourse to IDEA administrative procedures is required prior to the filing of an action seeking to vindicate the educational rights of a handicapped child where the complaint seeks relief that is available through the administrative process.").

Plaintiffs' claims, however, are distinguishable from the cases discussed above, because here the student is no longer alive. Indeed, in *W.B. v. Matula*, the Third Circuit suggested a narrow exception to the IDEA exhaustion requirement may exist "where the parents of a deceased child seek damages for a school board's failure to provide IDEA services while the child was still alive." 67 F.3d at 496. Citing *Matula*, United States District Judge Kim R. Gibson in *Taylor v. Altoona Area School District* held that the plaintiff's failure to exhaust her administrative remedies under the IDEA was excused as futile on the basis of her son's death. 737 F. Supp. 2d 474, 483 (W.D. Pa. 2010) (Gibson, J.). In *Taylor*, the decedent was a third grade student who suffered an acute asthma attack in school that tragically resulted in his death. *Id.* at 478-80. The plaintiff sued the school district under the IDEA, arguing that personnel at the decedent's school failed to properly execute the plans and procedures she created with the school to treat her son's severe asthma condition. *Id.* at 480.

District courts confronted with this issue in the context of a student's death, often by suicide, have found that exhaustion was futile. *Reed v. Kerens Indep. Sch. Dist.*, No. 3:16-cv-1228, 2017 WL 2463275 at *8 (N.D. Tex. June 6, 2017) (Carrillo Ramirez, J.); *Estate of D.B. v. Thousand Islands Cent. Sch. Dist.*, 169 F. Supp. 3d 320, 330 (N.D.N.Y. 2016) (Suddaby, J.), *abrogated in part on other grounds by Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195 (2d Cir. 2017); *Moore v. Chilton Cty. Bd. of Educ.*, 936 F. Supp. 2d 1300, 1308 (M.D. Ala. 2013) (Watkins, J.). These courts based their conclusions on a variety of rationales, all of which apply to the instant case. First, because Congress's intent in enacting the exhaustion requirement was to allow experts, rather than courts, to resolve the defects in a student's education plan, resolving defects in an education plan for a child who is no longer alive would not "usurp" the school district's authority in the manner protected by the exhaustion

9

requirement. *E.g.*, *Taylor*, 737 F. Supp. 2d at 483. Second, allowing an exception based on the death of a student will not incentivize parents and care givers to wait to bring their IDEA claims in order to forego administrative procedures in favor of bringing their claims directly in court. *E.g.*, *D.B.*, 169 F. Supp. 3d at 330. Lastly, futility of the administrative remedy is the foreseeable consequence of an IDEA claim for a student who is no longer alive, given that parents have nothing to gain from the equitable remedies available in administrative proceedings under the IDEA. *E.g.*, *Reed*, 2017 WL 2463275 at *7; *Moore*, 936 F. Supp. 2d at 1307, 1308. Because all of these rationales apply to the instant case, I find that Plaintiffs' failure to exhaust their administrative remedies is excused under the futility exception.

### B. Potential IDEA Claim

Defendant argues Plaintiffs should be precluded from raising an IDEA claim because no such claim was alleged in the Complaint. (Def.'s Br. at 13). Defendant contends that Plaintiffs have alleged a cause of action for failure to implement an IEP "throughout discovery, and through their expert report production[.]" (*Id.*). Plaintiffs implicitly concede that they did not raise an IDEA claim in their Complaint. (*See* Doc. 1 *generally*). Indeed, Plaintiffs appear to suggest that the evidence they offered through expert reports concerning failure to implement an IEP was provided in support of the Section 504 and ADA claims, rather than an attempt to assert an unpleaded IDEA claim. (*See* Pls.' Br. at 18-19 ("[T]he fact that these ADA and 504 claims are based on the same conduct as the IDEA makes no difference in terms of evaluating a claim relating to the failure to implement an IEP.")). Because Plaintiffs have neither asserted an IDEA claim nor argued that they plan to assert such a claim, I need not address this issue further.

### C. Count I: Section 504 of the Rehabilitation Act

As an initial matter, much of Defendant's argument in favor of summary judgment reveals a fundamental difference between how the parties conceive the claim, specifically with respect to C.B.'s suicide. Plaintiffs allege that C.B. was unlawfully

discriminated against because of the failure to properly implement his Section 504 Plan and seek to obtain compensatory damages for this discrimination, including for C.B.'s suicide. Defendants, on the other hand, believe Plaintiffs' claim is actually a tort claim for "failure to prevent suicide" masquerading as a Section 504 claim. Plaintiffs pleaded two tort claims in their initial complaint–wrongful death and survival action–and have not amended their Complaint since these tort claims were dismissed. Accordingly, I will construe Count I as alleging a true Section 504 claim for failure to accommodate and Defendant's argument on summary judgment as challenging whether Plaintiffs may recover compensatory damages for C.B.'s death under the Rehabilitation Act.[6]

Section 504 of the Rehabilitation Act bars all federally funded entities from discriminating on the basis of disability. 20 U.S.C. § 794(a). To establish a claim pursuant to Section 504, a plaintiff must demonstrate that (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at the school because of his disability. *S.H. v. Lower Marion School District*, 729 F.3d 248, 260 (3d Cir. 2013); *Ridgewood Bd. of Educ. v. N.E. ex rel M.E.*, 172 F.3d 238, 253 (3d Cir. 1999) (citation omitted), *superseded by statute on other grounds*. Where, like here, a plaintiff seeks compensatory damages on a Section 504 claim, the plaintiff must prove that the discrimination or denial of benefits at issue was intentional, or at least that WWSD acted with deliberate indifference to the underlying discrimination. *Shadie v. Hazelton Area Sch. Dist.*, 580 Fed. Appx. 67, 70 (3d Cir. 2014).

Defendant does not dispute that C.B. was disabled, that C.B. was otherwise

---

[6] I will also construe Plaintiffs' ADA claim in Count II as raising a true ADA claim for failure to accommodate and Defendant's argument on summary judgment as challenging whether Plaintiffs may recover compensatory damages for C.B.'s death under the ADA.

qualified to participate in school activities, or that WWSD receives federal funding. (*See generally* Def.'s Br.). Rather, WWSD argues it is entitled to judgment because the evidence supports neither a finding that C.B. was excluded from participation in, denied the benefits of, or subject to discrimination under Section 504 because of his disability nor a finding that WWSD intentionally discriminated against or was deliberately indifferent to any discrimination. (*Id.* at 5-8).

### 1. Denial of Benefits

Plaintiffs' Section 504 claim is based on a theory of failure to provide reasonable accommodation. *See Taylor*, 737 F. Supp. 2d at 489; *Nathanson v. Med. College of Penn.*, 926 F.3d 238, 370 (3d Cir. 1999). The question, therefore, is whether WWSD should have provided C.B. with the accommodations laid out in his Section 504 plans and whether WWSD did in fact provide him with these accommodations. *Taylor*, 737 F. Supp. 2d at 490.

It is undisputed that C.B. had Section 504 plans in place at school beginning in 2008 and that these plans included a provision that C.B.'s teachers would communicate with his parents via email when they had concerns about C.B.'s progress. (Def.'s SMF ¶¶ 4, 5; Pls.' SMF ¶¶ 4, 5). It is also undisputed that C.B. was failing a number of classes over the course of the 2012-2013 school year, and that Mrs. Beam scheduled and attended a meeting with school officials to discuss C.B.'s grades and his Section 504 Plan on April 30, 2013. (Def.'s SMF ¶¶ 7, 8, 11, 13; Pls.' SMF ¶¶ 7, 8, 11, 13). In her deposition, Mrs. Beam testified that she never received email communication from anyone about C.B.'s failing grades prior to contacting Mrs. Gribble to set up the April 30, 2013 meeting, and that she did not have access to her son's grades through Schoolbook beginning October of 2012. (Beam Dep. 48:10-12, 51:6-10, 65:15-18). Defendant has not offered any evidence contradicting Mrs. Beam's testimony. Accordingly, I find a genuine issue of material fact exists as to whether WWSD complied with C.B.'s Section 504 Plan provision pertaining to email communication while the original Section 504 Plan was still in effect.

Despite WWSD's adoption of the Amended Section 504 Plan following Mrs. Beam's meeting with the school, C.B. still failed three (3) classes at the end of the school year. (Def.'s SMF, Ex. "C" at 4-11, Ex. "I"[7]). Mrs. Beam testified that she only received one of the bi-monthly Schoolbook reports pursuant to the Amended Section 504 Plan. (Beam Dep. 96:1-12). She received this report on May 9, 2013. (Gribble Dep. 89:5-9). However, Mrs. Beam admitted that at some point after her meeting with the school, her online access to Schoolbook was restored. (Beam Dep. 93:24-25). Mrs. Gribble testified that she believed her secretary was sending the reports to C.B.'s parents but never followed-up to confirm whether the reports were actually sent. (Gribble Dep. 88:17-24).

Additionally, Anthony Zoppi testified he did not directly communicate with C.B.'s parents regarding any concerns he had over C.B.'s performance and instead submitted them to the Guidance Department. (Zoppi Dep. 86:6-23,102:17).[8] Another of C.B.'s teachers, James Rebar, testified that he did not feel the need to communicate with C.B.'s parents about his failing grades because "[C.B.] had everything he needed in order to succeed" despite acknowledging that students with ADHD may benefit from having people push them both at school and at home. (Rebar Dep. 25:12-16, 26:21-23). The evidence reveals a genuine dispute as to whether WWSD denied C.B. an educational benefit that he was entitled to because of his ADHD. *See Beam v. Western Wayne Sch. Dist.*, 165, F. Supp. 3d 200, 210 (M.D. Pa. 2016) (Caputo, J.) ("It was solely because of C.B.'s disability that he was subject to a Section 504 educational plan, and it was precisely the inadequate Section 504 plan that failed to accommodate

---

[7] Exhibit "I" to Defendant's factual statement is C.B.'s final failure notice sent home at the end of the 2012-2013 school year.

[8] Indeed, Mr. Zoppi emailed Mr. Cole on June 9, 2013— before the end of the school year—explaining that while C.B.'s grades increased after turning in some of his work from the previous quarters, those increases did not raise his grades to the passing range and that the only way C.B. could pass the class was by doing well on the final. (Def.'s SMF, Ex. "H").

13

to C.B.'s needs, that allegedly caused C.B. to commit suicide.").

### 2. **Deliberate Indifference**

Where compensatory damages are sought on a Section 504 claim, such as here, the plaintiff must demonstrate the denial of benefits was intentional. *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 269 (3d Cir. 2014). A showing of deliberate indifference satisfies the intentionality requirement. *Id.* To demonstrate deliberate indifference, plaintiffs "must present evidence that shows both: (1) *knowledge* that a federally protected right is likely to be violated . . . , and (2) *failure to act* despite that knowledge." *S.H. v. Lower Marion Sch. Dist.*, 729 F.3d 248, 265 (3d Cir. 2013) (citing *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). "Deliberate indifference does not require a showing of personal ill will or animosity toward the disabled person." *Id.* at 263 (quoting *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (internal quotation marks omitted)). It does, however, require a "'deliberate choice, rather than negligence or bureaucratic inaction.'" *Id.* (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009)).

The first prong of the deliberate indifference standard requires Plaintiffs show actual knowledge by WWSD, rather than what WWSD could have or should have known. *Id.* at 266. At the April 30, 2013 meeting, Ms. Hall informed C.B.'s teachers and other school officials of "the significance of [C.B.'s] feeling with regard to the suicidal ideations he experienced as they related to his fear of failing." (Hall Dep. 25:8-11). Mrs. Beam also told the attendees she was not being communicated with pursuant to the provision in C.B.'s Section 504 Plan, and no one tried to argue that they had been properly communicating with her in response. (Gribble Dep. 32:18-20, 36:21-24). In response to this shortcoming, C.B.'s Section 504 Plan was amended to require additional communication with Mr. and Mrs. Beam, namely, bimonthly progress reports, and carried over the email communication provision from the original plan. (Gribble Dep. 38:15-19; Def.'s SMF, Ex. "C"). Additionally, acknowledging C.B.'s previous failing grades and the possibility that he could fail a number of courses

for the school year, the attendees of the April 30, 2013 meeting agreed to allow C.B. to turn in late assignments to raise his grades from previous marking periods, and conduct locker checks to assist C.B. with completing and turning in these assignments. (Gribble Dep. 38:1-3, 32-34; Def.'s SMF, Ex. "C"). The evidence reflects, at the very least, a genuine dispute as to whether WWSD actually knew that C.B.'s previous Section 504 Plan was not being followed, that he was at risk for failing at the end of the year if no changes were made, and the serious potential consequences of failing.[9]

Regarding the second prong of the deliberate indifference standard, Plaintiffs must show WWSD failed to act, and that this failure was not mere negligence. *See Chambers v. Sch. Dist. Of Phila. Bd. of Educ.*, No. 12-3574, 537 Fed. Appx. 90 (3d Cir. 2013) (determining the school district knew the student was denied an educational benefit and "failed to act appropriately in a way that rose above mere negligence"). The facts show Plaintiffs did not receive any communication from C.B.'s teachers concerning his failing grades prior to the April 30, 2013 meeting. (Beam Dep. 48:10-13). Apart from the one Schoolbook report mailed to the Beam household on May 9, 2013, the only communications Plaintiffs received from the school for the entire school year concerning C.B.'s academic performance were standard-form report cards and failure notices mailed home at the end of each marking period. (Beam Dep. 69:18-24, 96:1-12; Gribble Dep. 89:5-9; Zoppi Dep. 86:14-17). Despite the lack of communication regarding C.B.'s academic performance, Principal Barrett nevertheless chose to directly communicate with Mrs. Beam when C.B.'s internet and Schoolbook access was discontinued around October 2012. (Beam Dep. 49:19-50:8; 51:18-52:5, 52:13-18, 19-25). Principal Barrett once again chose to directly communicate with Mrs. Beam on June 17, 2013 to inform her that C.B. was involved in an altercation on the bus that day. (Beam Dep. 119:7-10). This suggests that there may have been a reason for why the school reached out about C.B.'s behavioral issues but not his

---

[9] *See* text accompanying note 8, *supra*.

Schoolbook issues, rather than mere oversight.

Additionally, at least one of C.B.'s teachers, Mr. Zoppi sent reports and concerns about C.B.'s performance to Mrs. Gribble, acting on the belief that the Amended Section 504 plan required the school counselor to collect messages from C.B.'s teachers to send to Plaintiffs all at once. (Zoppi Dep. 86:6-23). Mrs. Gribble delegated the task of mailing the reports referenced in the Amended Section 504 Plan to the Beam household to her secretary and did not follow-up with her to confirm the reports were sent, believing her to be "responsible enough" to complete this task. (Gribble Dep. 88:17-24). Yet, Mrs. Beam only received one such report on May 9, 2013. (Beam Dep. 69:18-24, 96:1-12; Gribble Dep. 89:5-9; Zoppi Dep. 86:14-17). This evidence could support an inference that once Mrs. Beam's Schoolbook access was restored following the May 9, 2013, report, Mrs. Gribble's secretary may have deliberately chosen to stop mailing the reports to the Beam household, believing that Mrs. Beam could review the information about C.B.'s progress online for the remainder of the school year.

Ultimately, C.B. failed three courses at the end of the school year, even though the May 9, 2013 report reflected that C.B. was only failing two courses. (Def.'s SMF ¶ 27, Ex. "I"; Pls.' SMF ¶ 27). As in *Chambers*, the facts presented reflect "serious and repeated failures by the school District at several key junctures to ensure that [the student] was receiving the services that were required, and clearly known to be required." *Chambers*, 537 Fed. Appx. at 97. Accordingly, summary judgment is not proper on Count I because there are genuine disputes as to whether the School District denied C.B. an educational benefit as well as whether the school was deliberately indifferent.

### D. Count II: ADA

Section 504 and ADA claims are subject to the same analysis and thus may be addressed at the same time. *Weidow v. Scranton Sch. Dist.*, 460 Fed. App'x. 181, 184 (3d Cir. 2012) ("Because Congress has ***directed*** [that the ADA] be interpreted in a

16

manner consistent with [the Rehabilitation Act], we will consider [Plaintiff's] claims under those statutes together.") (citation and internal quotation marks omitted) (first two alterations in original); *Chambers v. Sch. Dist. Of Phila. Bd. Of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) (noting that because the same standards govern both Rehabilitation Act and ADA claims, the court "may address both claims in the same breath"). Summary judgment is therefore denied on Count II as well.

### E. Punitive Damages

Defendant argues Plaintiffs should be precluded from seeking punitive damages and any possible claims for punitive damages, such as the "allegations against Defendant for gross misjudgment and bad faith," should be dismissed with prejudice. (Def.'s Br. at 13-14). Punitive damages may not be awarded in lawsuits brought under Section 504 of the Rehabilitation Act and the ADA. *Barnes v. Gorman*, 536 U.S. 181, 189, 122 S. Ct. 2097, 2103 (2002). Acknowledging the unavailability of punitive damages in this case, Plaintiffs explicitly stated they were not seeking punitive damages in their opposition brief. (Pls.' Br. at 20). Because Plaintiffs are only pursuing claims for compensatory damages, Defendant's argument is moot and need not be addressed further.

## IV. Conclusion

For the above stated reasons, summary judgment will be **DENIED** on both Counts.

An appropriate order follows.

 December 13, 2018  /s/ A. Richard Caputo
Date A. Richard Caputo
United States District Judge